UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| Stephanie Olivas, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 17 CV 50197 |
| ) | Magistrate Judge Iain D. Johnston |
| Nancy A. Berryhill, Acting ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

# MEMORANDUM OPINION AND ORDER

Plaintiff Stephanie Olivas filed a Title II disability benefits application in May 2013, alleging that she was disabled based on a diffuse and intertwined set of mental and physical ailments (fibromyalgia, degenerative disc disease, anxiety). She was then 30 years old and had given birth to a daughter several weeks earlier.[1] A few days after filing the application, she began treatment with Dr. Susan Crowe. Although plaintiff was treated by others before and after this time, Dr. Crowe is important because she provided a letter that is plaintiff's best piece of evidence. Dr. Crowe opined that plaintiff, despite taking positive steps to address her problems—most impressively, losing well over 100 pounds—would never be able to work because of her "psychological afflictions." The administrative law judge ("ALJ") did not find this letter convincing for multiple reasons. Plaintiff's main argument for remand is that this analysis was flawed. As explained below, this Court does not find a basis for second-guessing this decision.

## BACKGROUND

---

[1] It is not known what prompted her to apply for benefits so soon after giving birth.

1

The medical narrative begins—as the ancients used to say—*in medias res*. The first medical visit in the record was on October 31, 2011, when plaintiff saw Dr. Robert Dorman at the Whiteside County Health Department ("Whiteside"), but plaintiff was then already taking Norco, Dilaudid, and other medications. One of Dr. Doorman's first recommendations was that she begin "tapering [these] narcotics." R. 373.

Over the next couple of years, plaintiff received treatment at Whiteside. Although Dr. Dorman was apparently acting as the primary care physician, plaintiff saw other individuals as well. On April 11, 2012, plaintiff told her doctors that she had "recently started a lifestyle change based on the biggest loser tv show" and was "committed to" losing weight. R. 345. In late August 2012, plaintiff saw Jennifer Hooker, a counselor at Whiteside. R. 20. Around this time, plaintiff learned that she was pregnant. In the latter part of April 2013, plaintiff gave birth to her daughter.

On May 14, 2013, she filed her disability application.[2] On May 17, 2013, she first saw Dr. Crowe who was at the Midwest Wellness Health. Dr. Crowe soon moved out of state, but plaintiff continued to consult with her through videoconferences. Also, plaintiff periodically returned to Whiteside, seeing Ms. Hooker and Dr. Dorman. It is unclear whether either Dr. Crowe or Dr. Dorman were coordinating the overall care or whether plaintiff was instead taking the lead in deciding who to see and when. In any event, the following chart from plaintiff's Adult Disability Report (R. 266) summarizes the medications she was taking around this time:

---

[2] She alleged an onset date of July 15, 2010, even though she continued to work up until April 2011. It is not known why she chose this earlier onset date as it does not appear to coincide with any particular health event.

| | | |
|---|---|---|
| Cymbalta | CGH Dixon Health Center | depression and pain |
| Cymbalta | Susan Crowe, Midwest Wellness Health Center | depression and pain |
| Cymbalta | Whiteside County Health Dept | for fibromyalgia |
| dalotid | CGH Dixon Health Center | pain management |
| delotid | Susan Crowe, Midwest Wellness Health Center | pain |
| Flexeril | Whiteside County Health Dept | muscle relaxant to help with pain management - I had to switch this because it made me ill |
| Norco | CGH Dixon Health Center | pain management |
| Norco | Susan Crowe, Midwest Wellness Health Center | pain management |
| Norco | Whiteside County Health Dept | for pain management |
| Oxycodone | Susan Crowe, Midwest Wellness Health Center | for pain management |
| Prozac | Whiteside County Health Dept | for depression and psych issues |
| Soma | CGH Dixon Health Center | pain management |
| Soma | Whiteside County Health Dept | muscle relaxant to help with pain management |
| Xanax | CGH Dixon Health Center | for anxiety |

On October 8, 2013, plaintiff was examined by consulting psychologist Dr. Peggau who diagnosed her with morbid obesity. He did not diagnose her with any psychological ailments.

In August 2014, plaintiff returned to the Whiteside, and resumed counseling with Ms. Hooker. She was then "separated from her husband and wanted help getting her anxiety under control." Dkt. #9 at 4.

In January 2015, plaintiff consulted with Dr. Buddaraju, a rheumatologist. In March 2015, plaintiff began treatment with Dr. Barry Lopez, a psychiatrist who appears to have been acting in the role of a medication manager. On September 23, 2015, Dr. Lopez submitted a one-page "To Whom It May Concern" opinion letter, discussed below.

On September 28, 2015, the first administrate hearing was held. Plaintiff was still not represented by counsel, but she took steps to prepare for the hearing. She went to both Dr. Crowe and Dr. Lopez and asked them to write opinion letters, and then faxed those letters to the Agency before the hearing. At the hearing, plaintiff requested a continuance so that she could obtain counsel. A few weeks later, plaintiff retained her current counsel, and a second hearing was held

3

on January 11, 2016. R. 163. Plaintiff was questioned first by her attorney. Plaintiff testified that she was diagnosed with fibromyalgia "back in 2010," and described the pain as feeling "like pins and needles whenever somebody [] touche[d]" her. R. 49. She sometimes felt better after taking Cymbalta. She could not stand or sit for more than 10 to 15 minutes at a time. Counsel asked about the weight loss. Plaintiff answered: "I've lost 141 pounds. Because that was recommended to me, that maybe some of the fibro had to do with being obese." R. 52. Plaintiff went to Weight Watchers, and stated that losing weight "helped" with her pain. *Id.*

Plaintiff testified that her daughter went to daycare, or stayed with plaintiff's mother-in-law. Plaintiff worried about her daughter because she didn't "trust the daycare." R. 53. She also had fears about safety in the home, and constantly checked door and window locks. She was traumatized growing up because she "watched [her] mom every day get beat up." R. 55. She had an ex-boyfriend who was threatening, and plaintiff took Ativan at night to deal with "flashbacks all the time of [the ex-boyfriend] hitting [her.]" *Id.* She was afraid of germs, and washed her hands "every 15 minutes" throughout the day. R. 56.

Plaintiff saw Dr. Crowe through videoconferencing, but also texted and emailed her. They saw each other face-to-face every four to six months. The relationship was described as close. R. 58 ("Dr. Crowe listens to me about everything. She actually wants me to tell her everything. If I go [to] the walk-in clinic locally at home for a bladder infection, she wants to know that. She wants to be very involved completely in my care.").

The ALJ then asked questions. She asked whether there were any changes since the 2010 onset date. Plaintiff stated that her problems had "gotten worse," and identified a February 2013 car accident as a pivotal downward turning point. Before this accident, she was "able to do most normal activities, with some limitations," but since then had not been able to "walk that much."

R. 60.³ The ALJ asked whether plaintiff "eventually eliminated opioid-based pan medications." R. 61. Plaintiff stated that she had "reduced" those medications but was still "currently taking them." *Id.* Most of plaintiff's doctor expressed concern, in varying degrees, about plaintiff's continued reliance on opioids. For example, Dr. Dorman in August 2014 wrote the following: "Pt was informed that I feel that she needs to get off of these Narcotics. Pt needs to be on a medication that helps the nerve pain. I explained to pt that the medication that she is currently on will not help her fibromyalgia pain at all." R. 508.

At the end of the questioning, the ALJ briefly addressed Dr. Crowe's opinion letter, asking counsel about the diagnosis that plaintiff had "psychosomatic addictive disease," which was one the ALJ had "never seen before" and found no information on it after doing some research, nor could she find any references to it anywhere else in the record. *Id.* at 69-70. The ALJ asked plaintiff's counsel whether she had "any information" on this diagnosis, and counsel answered that she did not ("it really is something that I haven't seen repeated in the record") although she added that she was "not saying it's not accurate." R. 70.

On February 10, 2016, the ALJ issued a 21-page decision, finding that plaintiff had the residual functional capacity ("RFC") to do light work subject to certain conditions. At Step Two, the ALJ found that the following impairments were severe: "obesity; mood disorders; anxiety; obsessive-compulsive disorder (OCD); and myalgias." However, the ALJ found that plaintiff's fibromyalgia and degenerative disc disease were not severe impairments. The ALJ noted that plaintiff claimed she had the back problem since 2005, yet was able to work during many of

---

³ The ALJ seemed skeptical about this accident given that there were no reports of plaintiff receiving any medical treatment or filing a lawsuit. However, plaintiff explained that she received massage therapy (she would have been seven months pregnant at the time) and "settled outside of court" because she did not feel that the other driver was purposefully "trying to hurt" her because it was "just snowy out." R. 61. During this discussion, plaintiff mentioned that she had "been in a car accident every two or three years since 1996." R. 60.

5

those years. The ALJ noted that Dr. Buddaraju found that plaintiff's back problem was minor.[4]
As for the fibromyalgia, the ALJ concluded that "no diagnostic findings and few physical findings" supported this diagnosis. R. 14.

At Step Three, the ALJ evaluated the Paragraph B criteria, finding that plaintiff's limitations in activities of daily living were mild for the following reasons:

> She was able to attend to her hygiene/personal care. She exercised daily. She was able to follow lifestyle changes, vis-a-vis Biggest Lo[s]er television show and Weight Watchers. She was involved with scrapbooking, couponing and going to movies with friends. She cared for her infant daughter, although received help from her husband who did the laundry, grocery shopping, and cooking and her mother-in-law who did the cleaning and helped with the baby. Significantly, she testified that between 2010 and through part of 2013, she could do most "normal" activities but with some limitations.

R. 15 (citations omitted). The ALJ found that plaintiff had moderate limitations in both social functioning and concentration, persistence and pace. In support of the latter finding, the ALJ noted the following:

> She cared for her young infant and was noted to be an attentive mother. She was able to administer her own medications. She understood detailed information about her medications, side effects, risks, and benefits as well as information about her conditions. The claimant was able to journal and follow diet programs successfully (Weight Watchers, Biggest Loser). She was able to text, email and video conference her physician, evidencing ability to use virtual technology through computers, internet, and cellphones. She also made numerous lists and checklists and was able to follow them.

*Id.* (citations omitted).

In the RFC analysis, the ALJ found that plaintiff's testimony was not credible. The ALJ cited five reasons. First, there were treatment gaps. Second, plaintiff engaged in daily activities that were inconsistent with her testimony—such as exercising five to ten hours a week and lifting small weights. Third, plaintiff's allegations were "significantly out of proportion" to the

---

[4] He also stated that the degenerative changes did "not explain [plaintiff's] significant pain." R. 536.

objective medical findings. R. 26. Fourth, she only received conservative treatment. Fifth, she was not "entirely compliant" in taking her medications. *See* R. 27 ("Records note she was sometimes not taking medication at all, took it in unprescribed doses, ran out, or did not obtain due to insurance."). The ALJ's analysis of the medical opinions is discussed below.

**DISCUSSION**

Plaintiff's sole argument for a remand is that the ALJ erred in not giving weight to three opinions. Two of them were identified above—namely, Dr. Crowe's and Dr. Lopez's September 2013 letters. The third alleged opinion is also from Dr. Crowe. It is not an official opinion in the sense of being a typed-out letter or a completed agency form or questionnaire. Instead, it consists of three handwritten statements plaintiff's counsel extracted from Dr. Crowe's notes on June 6, 2014. The statements are the following: (1) "Due to the pain, plaintiff has difficulty sitting for longer than 15 minutes at a time"; (2) "Plaintiff cannot pick up her daughter at any angle"; and (3) "Plaintiff has obsessive thoughts."[5] Dkt. #9 at 9-10.

Before considering each opinion, three general points should be noted. First, by limiting her appeal to just the medical opinions, plaintiff has chosen a narrow path to a remand. She has *not* challenged other significant adverse findings. One is the ALJ's Step Two conclusion that neither plaintiff's fibromyalgia nor her degenerative disc disease met the relatively lenient standard of being called a severe impairment. Another is the adverse credibility finding based on the above five reasons. In cases involving fibromyalgia, the outcome often depends heavily on the credibility analysis. *See Johnson v. Berryhill*, 2018 WL 3855017, *3 (7th Cir. Aug. 14, 2018) ("Resolving the conflicting evidence about such a close case, in which subjective pain is so critical, is a job for the ALJ in the first instance."). Plaintiff also has not argued that the ALJ

---

[5] These quotations are from plaintiff's brief, not the underlying notes.

7

improperly "played doctor" or that a medical expert should have been called. All these arguments are thus waived. *See Baker v. Colvin*, 2015 WL 719604, *4 (N.D. Ill. Feb.18, 2015).

The Court has a second observation. This one about plaintiff's presentation of her arguments. The opening brief is top-heavy with facts. The fact section occupies the first nine pages of the 12-page brief, leaving little space for the substantive arguments. Plaintiff's argument attacking Dr. Crowe's letter is two paragraphs; the argument addressing Dr. Lopez's letter is one paragraph. Dkt. #9 at 11-12. The reply brief is just over two pages. But the problem is not necessarily with the length of the fact section but more that it is so unconnected to the later arguments. Almost none of the earlier facts play any role in the analysis, leaving the Court to wonder why many of them were included. Conseequently, the fact section is a kitchen sink of raw facts. Perhaps the goal was to create the impression that plaintiff had a lot of medical problems. But as counsel well knows, a long list of diagnoses does not mean the claimant will be found disabled, as is evidenced by two recent Seventh Circuit decisions. *Truelove v. Berryhill*, 2018 WL 6242284, *1 (7th Cir. Nov. 28, 2018) (affirming denial of claimant who had "numerous mental-health diagnoses"); *Imse v. Berryhill*, 2018 WL 6172035, *1 (7th Cir. Nov. 26, 2018) (affirming denial of claimant "who suffers from numerous mental and physical impairments"). Given that the ALJ's opinion typically includes a long chronology, counsel would be better served by highlighting significant facts, such as those that differ from the ones emphasized by the ALJ.[6]

---

[6] Two other concerns about the opening brief. First, for some unknown reason, counsel chose to put most of the fact section into footnotes. Like kudzu, these footnotes have grown so large that they dwarf the text for the first half of the brief. Page 6 is entirely taken up by a footnote. Page 3 has one text sentence, and the rest is a footnote. Page 5 has only two sentences of text. The Court has no objection to the judicious use of footnotes. (Indeed, this text is in a footnote.) But this was excessive and not based on any obvious rationale. Moreover, by putting so much material in a footnote, counsel risks waiving arguments. *See, Truelove*, 2018 WL 6242284 at *4 ("this argument appears in a single-sentence footnote, without record support, and so is also waived."). In fact, arguments made in passing in footnotes are waived. *Long v. Teachers' Retirement Sys. of Ill.*, 585 F.3d 344, 349 (7th Cir. 2009); *U.S. v. White*, 879

There is a final general point. In her opening brief, plaintiff briefly referred to the ALJ's failure to explicitly apply the checklist of factors under the treating physician rule. This is true, but the Court finds that plaintiff did not develop this argument. It was only included in a footnote, and plaintiff did not offer her own analysis how each factor should have been applied. Then, after the Government responded that the ALJ's implicit analysis was sufficient, plaintiff in her reply brief did not offer a response. For these reasons, the Court finds that this argument was undeveloped and therefore waived. *See Baker*, 2015 WL 719604 at *4 ("undeveloped" arguments, which rely on "passing references" to legal rules are deemed waived).

Returning to the three opinions, the Court begins with the third one. It is true, as plaintiff states, that the ALJ failed to explicitly analyze Dr. Crowe's three statements in her June 2014 notes. The Government argues that the ALJ was not obligated to do so because they were too informal and vague to constitute a medical opinion. The Court need not evaluate that argument because there is a more basic reason why these statements need not be evaluated here: They are essentially duplicative. They offer a similar, albeit less fully formed, opinion to the one Dr. Crowe gave a year later. In plaintiff's reply brief, she seems to agree with this assessment. *See* Dkt. #15 at 1 (asserting that the June 2014 statements "reiterate[]" the conclusions in the later more "explicit" letter). Plaintiff's appeal will stand or fall on whether the ALJ was justified in rejecting the 2015 letter. If so, then the same reasons would apply to the earlier statements.

The Court next considers Dr. Lopez's opinion. It also can be quickly addressed. The ALJ offered several reasons for giving it little weight, including that the treatment relationship was "quite brief," consisting of only a few visits in 2015. But there was a more basic reason to

---

F.2d 1509, 1513 (7th Cir. 1989). Second, several times counsel quoted from a source document, but then failed to include quotation marks. Counsel should be more careful about including quotation marks when appropriate.

support the ALJ's decision. The letter did not contain any firm opinion that was contrary to the ALJ's analysis. Set forth below is the part that comes closest to being an "opinion":

> At this point in time Ms. Olivas is reporting an inability to work due to the severity of her psychiatric symptoms. She also reports she has also been unable to work because of her psychiatric condition since at least 2012. Any consideration that can be given to Ms. Olivas, given her current psychiatric condition will be greatly appreciated.

R. 459. Dr. Lopez makes clear that he was relying on plaintiff's "reports" about her condition. In fact, the letter largely mirrors the description plaintiff gave to Dr. Lopez when she requested the letter. *See* R. 573 ("[Plaintiff] is wondering if a letter can be written to help support her upcoming disability application. She states that she last worked at the end of 2012 and she can not work anymore due to the debilitating nature of her psychiatric conditions and her health issues."). What is notably missing is any independent and affirmative statement from Dr. Lopez. He did not state that she was limited in any specific way. For this reason alone, the Court finds that the ALJ was entitled to give this opinion little weight.

The Court now turns to Dr. Crowe's 2015 letter, which is stronger than the first two opinions. The ALJ's analysis began with a thesis statement of sorts, in which the ALJ stated that the letter was "vague, conclusory, lacks support, lacks a function-by-function analysis, and is incomplete." R. 28. The ALJ then offered specific examples and rationales. As a preliminary observation, the Court notes that the characterization of the letter as conclusory might suggest that it was short or written with little care. But this would be an unfair. The letter is lengthy (three pages single-line spaced) and Dr. Crowe clearly put in some effort, showing that she cares about her patient. Still, for the reasons set forth below, the Court finds that the ALJ offered multiple reasons for not giving this opinion substantial weight.

10

One of the ALJ's rationales—the strongest, in this Court's view—was that Dr. Crowe's letter was inconsistent with, or at least not supported by, her notes. The ALJ cited three examples. First, the ALJ focused on the following assertion in the letter:

> OA[7] of both ankles and thoracic spine: Documented previous fractures with poor healing have affected her ability to stand or sit consistently for any period of time. While this is variable from day to day—the ankles cannot tolerate more than one hour of standing or walking without sitting to rest.

R. 457. Although this assessment was only one part of a longer letter, it is important because it is one of the few instances where Dr. Crowe set forth a specific work limitation. The ALJ found that this conclusion was unsupported because there were no record references to "any abnormalities involving the ankles." R. 28. Notably, plaintiff has not even attempted to respond this claim, either in her opening or reply brief. This rationale thus stands unrebutted. And in reviewing the record, the Court found no references to ankle problems. *See, e.g.*, R. 549 (Dr. Buddaraju: "Ankles: No swelling, no tenderness, good ROM"). The Court likewise found no instance where plaintiff mentioned his problem. She did not complain about it at the hearing. In short, this part of the doctor's statement comes out of the blue.

A second inconsistency was Dr. Crowe's assertion that plaintiff had "fibromyalgia pain flares 4-6 times weekly." R. 28. The ALJ again noted that Dr. Crowe made "no reference of this in her records" and also that it was not "corroborated by [plaintiff's] testimony." *Id.* Plaintiff's only response in her briefs is an indirect one. She did not comment on the assertion about the flares occurring 4-6 times weekly, thus conceding that there was no direct support for this claim, but instead attempted to re-focus the discussion on the larger question of whether plaintiff was having any fibromyalgia-related pain and then cited to a few places in the record where there

---

[7] OA presumably is an abbreviation for osteoarthritis.

11

were reports of "diffuse" pain. *See* Dkt. #15 at 2 (citing to R. 216, 527, 538). But this does not directly respond to the ALJ's criticism.

The third inconsistency was that Dr. Crowe did not order updated x-rays and relied on a 2005 report, one that was not in the record. Plaintiff's only response was in her reply brief and she then only stated that this failure to order X-rays was not a reason to "wholly" discredit a medical opinion. *Id.* But this argument ignores that it was not the sole reason.

In sum, the ALJ's reliance on these consistencies was one valid reason, when joined with others, for rejecting the opinion. *See Lafayette v. Berryhill*, 2018 WL 6168175, *2 (7th Cir. Nov. 26, 2018) ("the ALJ permissibly discredited Dr. Redi's answers to the diagnostic questionnaire because they were inconsistent with his treatment notes").

Another rationale was that Dr. Crowe asserted that plaintiff's "psychiatric conditions prevented [her] from leaving home—yet [she] went to the gym, worked out, went out with friends, and went to the Weight Watcher meetings." R. 29. The plaintiff again offers only a brief and vague response. She has not challenged the underlying factual findings in any material way, other than pointing to a few vague references to having "social anxiety" on occasion. *See* Dkt. #9 at 11 (citing R. 446). Therefore, this rationale, like the previous one, stands unrebutted. It is notable that Dr. Crowe's letter only vaguely refers to plaintiff's exercise even though it was fairly extensive and obviously played a role in her dramatic 141-pound weight loss. This achievement undoubtedly required a high degree of persistence and planning.

As another rationale, the ALJ found that Dr. Crowe relied heavily on plaintiff's subjective reporting and "seemed to uncritically accept as true most, if not all, of what the claimant reported." R. 28-29. This rationale is less strong than some of the others, in part because any doctor assessing psychiatric symptoms must rely to some degree on subjective reports. *See*

12

*Price v. Colvin*, 794 F.3d 836, 840 (7th Cir. 2015). Also, unlike Dr. Lopez, Dr. Crowe explicitly stated that she found plaintiff's pain statements were credible, and she also had observed some problems in her "interactions" with plaintiff (which were described vaguely as being "catastrophic in nature"). R. 456-57. Although the ALJ should have acknowledged these contrary points more, the Court does not find that, given the other rationales, that these omissions are sufficient for a remand. As the Government noted, plaintiff's arguments face the problem that she has not challenged the separate credibility finding.

The ALJ also found that the letter was vague and noted that the ALJ was not an expert in several of the impairments under consideration. As for the vagueness charge, the ALJ did not cite to specific examples, but the ALJ may have been referring to the fact, as noted above, that the doctor did not offer many specific limitations. In reviewing the letter, this Court also found portions of it to be opaque in places, such as the following two examples:

- Though [plaintiff] clinically showed a marked number of trigger points for neuromuscular pain resulting in the diagnosis of fibromyalgia, I remain convinced that she has psychosomatic additive pain, interfering with the success we might expect from stretching, exercise and the variety of pain treatments she has prescribed to address her multitude of physical pain issues.
- Though tempting to interpret her fatigue and low mood as depression, I would be far more inclined to consider them as manifestations of the limitations placed on her quality of life *and enjoyment of the stronger aspects of her intellectual function*[.] *Her pursuit of happiness with her* husband, daughter and other family, as well as the satisfaction she previously enjoyed from purposeful contributions to society are drastically hindered at this time. This has gone on for many years, and is most definitely expected to persist for many years to come[.]

R. 458 (italics were supplied by Dr. Crowe in the original).

On balance, the Court finds that the above rationales, while not all perfect, are still sufficient to justify the ALJ's finding. In addition to these rationales, the Government has

13

pointed to a series of other questions that were alluded to by the ALJ in the narrative portion of the brief. These include the following:

- Dr. Crowe noted that plaintiff had a lifetime of psychiatric symptoms of anxiety, obsessive thinking, and behaviors, yet the ALJ noted that there was no record evidence of psychiatric treatment until December 2011, and no evidence of counseling until August 2012.
- Dr. Crowe noted that plaintiff had generalized muscle tenderness, but the ALJ noted that this was during an e-visit, so it was unclear how Dr. Crowe assessed this subjective complaint.
- [In March 2015,] Dr. Crowe noted generalized muscle tenderness throughout with notable max points at lower cervical and into shoulders and arms, although again, the ALJ noted that it was unknown how this was assessed, as this was an e-visit.

Dkt. #14 at 7-9.

This Court also observed possible incongruities that would need to be addressed if this case were remanded. One issue not fully addressed by the ALJ was whether Dr. Crowe's opinion was consistent with the other medical opinions. In her briefs, plaintiff only made one vague reference to this issue, stating in conclusory fashion that "Dr. Lopez' office visit notes were consistent with Dr. Crowe's opinions." Dkt. #9 at 12. But it is not clear that they were consistent. Dr. Crowe believed that plaintiff could never recover from her "afflictions," and basically had exhausted all possible treatments; whereas, Dr. Lopez seemed at least hopeful that plaintiff could improve. *See* R. 459 ("We are continuing to try and assist Ms. Olivas [to] realize a reduction in her psychiatric symptoms [] through ongoing medication management, and hopefully this will be the case going forward."). Also, as noted above, Dr. Crowe believed that psychosomatic additive pain was the central problem, but Dr. Lopez did not reach a similar conclusion.

More broadly, Dr. Crowe's opinion differed from the other doctors in several respects. For example, she opined that plaintiff's degenerative disc disease was "consistent with her reported flares of pain;" whereas, Dr. Buddaraju questioned whether this was true. *Cf.* R. 457 to

14

R. 536. As for the psychological diagnoses, there was no uniform consensus among the doctors. Dr. Peggau found that plaintiff had no psychological impairments. Dr. Crowe noted that, although plaintiff's counselors believed that she was being hampered by "repressed anger," Dr. Crowe noted that she had "not witnessed her having" any such problems. R. 458.

Dr. Crowe's letter also fails to match up with plaintiff's testimony in several ways. As noted above, plaintiff's specific exercise routines and activities were not acknowledged in the letter. Dr. Crowe also did not mention that plaintiff had been separated on and off again from her husband for six years, but instead found that plaintiff was living in a "loving and supportive home environment." R. 457. It is possible that the home environment was still supportive despite the marital troubles, but it still raises a question of why Dr. Crowe did not mention this fact. Finally, Dr. Crowe made no reference to the February 2013 car accident that plaintiff identified as an important event, one that started her downward spiral.

Then finally there is the looming issue of plaintiff's continued narcotics usage for many years. Here too, Dr. Crowe seemed to take a slightly different and more tolerant approach. Although she attempted to reduce plaintiff's usage, she was comfortable enough to allow plaintiff to continue relying on the narcotics, and even referred in her 2015 letter to plaintiff as being treated with, in the doctor's words, "daily narcotic therapy." R. 457. By contrast, Dr. Dorman stated in his first visit with plaintiff, way back in 2013, that she should start tapering these medications. He expressed that view again in 2014. Dr. Buddaraju expressed similar concerns in 2015, advising plaintiff to "[m]inimize use of narcotics." R. 536.

The Court acknowledges that the ALJ did not explicitly rely on all of these latter arguments cited by both the Government and this Court. The Court raises them because, if there were a remand, these issues would present further hurdles as they would need to be considered in

15

a more complete analysis. However, to be clear, the Court finds that the ALJ's stated rationales, for the reasons discussed above, were collectively sufficient to justify the ALJ's decision.

## CONCLUSION

For all the above reasons, plaintiff's motion for summary judgment is denied, the Government's motion is granted, and the ALJ's decision is affirmed.

Date: December 17, 2018        By: _____
                        Iain D. Johnston
                        United States Magistrate Judge